**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

**SHORERIVERS, INC.**
114 South Washington Street, Suite 301
Easton, MD 21601
Talbot County

and

**DORCHESTER CITIZENS FOR**
**PLANNED GROWTH, INC.**
P.O. Box 576
Cambridge, MD 21613
Dorchester County

and

**CHESAPEAKE BAY FOUNDATION,**
**INC.**
6 Herndon Avenue
Annapolis, MD 21403
Anne Arundel County

      Plaintiffs,

v.

**VALLEY PROTEINS, INC.**
Route 2, Box 156
Winchester, VA 22601

      Defendant.
_____

## **COMPLAINT**

      Plaintiffs ShoreRivers, Inc., Dorchester Citizens for Planned Growth, Inc., and

Chesapeake Bay Foundation, Inc. by and through their attorneys, Chesapeake Legal Alliance and

Chesapeake Bay Foundation, file this Complaint alleging the following:

## STATEMENT OF THE CASE

1.      This is a citizen suit for declaratory and injunctive relief, the assessment of civil

penalties, and other appropriate relief against Defendant Valley Proteins, Inc. ("Defendant" or

"Valley Proteins") for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et*

*seq.* (hereinafter the Clean Water Act ("CWA")), and the Resource Conservation and Recovery

Act ("RCRA"), 42 U.S.C. § 6901 *et seq*.

2.      Defendant's actions also constitute an unauthorized discharge to waters of the State. MD.

CODE ANN., ENVIR. § 9-322.

3.      These violations occurred and are occurring at the processing facility owned and operated

by Valley Proteins, which is located at 5420 Linkwood Road, Linkwood, Maryland 21835 within

Dorchester County ("Facility"). The Facility is a chicken rendering plant that processes poultry

waste products, such as offal, blood, and feathers, into byproducts for sale. The Facility

generates industrial wastewater and waste sludge. The wastewater is treated on site and then

discharged to the Transquaking River ("River").

4.      The State of Maryland is authorized to administer the CWA's National Pollutant

Discharge Elimination System ("NPDES") permitting program. *See* 33 U.S.C. § 1342; Maryland

Department of the Environment and U.S. Environmental Protection Agency, Memorandum of

Agreement (1989), *available at* https://www.epa.gov/sites/default/files/2013-09/documents/md-

npdes-moa.pdf.

5.      The Maryland Department of the Environment ("MDE" or "Department") issued NPDES

Permit No. MD0003247 (State Permit 99-DP-0024) ("Permit"), effective March 1, 2001 to

February 28, 2006, which authorizes Valley Proteins to discharge, subject to effluent limitations

2

and conditions, wastewater from the Facility to the Transquaking River. The Permit also regulates the removal of sludge from the Facility and requires groundwater monitoring.

6.     The Permit expired in 2006 but has been administratively extended by MDE. Valley Proteins continues to operate under the administratively extended Permit; as such it remains subject to those original Permit terms and conditions as issued in 2001.

7.     Defendant has discharged and continues to discharge pollutants into waters of the United States in violation of Sections 301 and 402 of the CWA. 33 U.S.C. §§ 1311, 1342.

8.     Defendant has discharged pollution to waters of the State, including groundwater, in violation of state law and regulations. MD. CODE ANN., ENVIR. § 9-322; MD. CODE REGS. 26.08.02.09.

9.     Defendant's handling, storage, treatment, transportation, and/or disposal of solid waste at the Facility may present an imminent and substantial endangerment to health and the environment, in violation of RCRA. 42 U.S.C. § 6972(a)(1)(B).

10.    On April 13, 2021, ShoreRivers Inc., Dorchester Citizens for Planned Growth, and Chesapeake Bay Foundation, Inc. (collectively, "Plaintiffs") sent by certified mail a Notice of Intent to Sue Letter ("NOI") for violations of the CWA and RCRA to Valley Proteins, Valley Proteins' Registered Agent, and to the other recipients required to receive notice by the Acts. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2; 42 U.S.C. § 6972(b)(2); 40 C.F.R. § 254.2; Notice of Intent to File Citizen Suit for Violations of the Clean Water Act, the Resource Conservation and Recovery Act, and the Maryland Water Pollution Control Act at Valley Proteins, Inc. - Linkwood Facility NPDES Permit MD0003247 (State Permit 99-DP-0024) [hereinafter "NOI"] (attached as Exhibit A and incorporated by reference herein).

11.     Upon information and belief, Valley Proteins has not complied with effluent limits and other terms and conditions of the Permit. Defendant continues to violate its Permit.

12.     Upon information and belief, the handling of waste generated by the Facility is posing an imminent and substantial endangerment to human health and to the environment and is ongoing.

13.     Defendant has demonstrated an unwillingness and/or inability to comply with the terms of the Permit as well as federal and state law.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331.

15.     Pursuant to 33 U.S.C. § 1365(c) and 42 U.S.C. § 6972(a), venue is proper because the CWA and RCRA violations alleged in this Complaint occurred and continue to occur in this District.

16.     This Court has supplemental jurisdiction over state law claims included in this Complaint pursuant to 28 U.S.C. § 1367.

17.     Pursuant to the CWA, 33 U.S.C. § 1365(b)(1)(A) (requiring 60 days notice), and RCRA, 42 U.S.C. § 6972(b)(2)(A) (requiring 90 days notice), Plaintiffs gave notice, more than 90 days prior to commencing this action, to all required parties including: 1) Valley Proteins, Inc.; 2) MDE; 3) the United States Environmental Protection Agency (EPA); and 4) the State of Maryland.

18.     Neither EPA nor the State of Maryland has commenced or is diligently prosecuting a civil or criminal action against Defendant in a court of the United States or of the State of Maryland, or pursuing an administrative penalty action, to require compliance with the laws, rules, regulations, permits, standards, or limitations at issue in this case.

19.     As explained below, Defendant is in violation of effluent standards and limitations set forth in its Permit, and Defendant is not operating its Facility in a manner that achieves compliance with the terms and conditions of the Permit, the CWA, and RCRA. Defendant has also failed to take corrective action to abate the Permit violations or the endangerment conditions alleged. Therefore, the violations alleged herein are continuing and will likely continue until this Court enjoins Defendant from discharging in violation of the Permit and orders Defendant to address and remedy the underlying causes of the Permit, CWA, and RCRA violations.

## PARTIES

20.     Plaintiff ShoreRivers, Inc. ("ShoreRivers") is a 501(c)(3) nonprofit organization founded in 2017 whose mission is to protect and restore Eastern Shore waterways through science-based advocacy, restoration, and education. ShoreRivers is headquartered in Easton, Maryland with field offices in Chestertown and Galena, Maryland. ShoreRivers has a dedicated staff of educators, scientists, restoration specialists, and advocates that focus on policies and projects that improve the health of rivers on the Delmarva peninsula. ShoreRivers staff includes four Riverkeepers who regularly patrol and monitor waterways in the Eastern Shore: the Chester Riverkeeper; the Choptank Riverkeeper; the Miles/Wye Riverkeeper; and the Sassafras Riverkeeper.

21.     ShoreRivers represents more than 2,000 members, over 1,100 of whom live on the Eastern Shore of Maryland. ShoreRivers supports its members by utilizing the CWA and other environmental laws to stop pollution that threatens public health, impairs water quality, damages ecosystems, and negatively impacts the ability of its members to use and recreate on the waterways on the Eastern Shore.

22.     ShoreRivers' members include individuals who enjoy the aesthetic value of the Transquaking River and enjoy fishing, boating, birdwatching, canoeing, and kayaking in and around the River and its tributaries. Additionally, ShoreRivers members include individuals who live near the Facility, source their drinking water from wells, and are concerned about groundwater contamination that could impact their health.

23.     The interests of ShoreRivers' members are negatively impacted by Defendant's violations of RCRA. Valley Proteins' actions may have created and may continue to create an imminent and substantial endangerment to the River and the underlying groundwater, which threatens members' use and enjoyment of the River and may continue to present a potential human health risk.

24.     ShoreRivers members are harmed by the violations alleged in this complaint. Defendant's violations of CWA, RCRA, and Maryland state law have resulted in pollution which impairs the water quality, threatens public health, and harms aquatic habitats. These violations contribute to algae blooms, fish kills, and unsafe swimming conditions in the Transquaking River, its tributaries, and Higgins Mill Pond, a man-made impoundment in the River downstream of the Facility. Defendant's violations have diminished ShoreRivers' members' use and enjoyment of these waterways and continue to pose human health risks. As a result, ShoreRivers' members are less likely to recreate on and around these waterways in the future.

25.     Plaintiff Dorchester Citizens for Planned Growth, Inc., (DCPG) is a 501(c)(3) nonprofit organization founded in 2007 to ensure sustainability and quality of life within the lands and waters of Dorchester County, Maryland. DCPG is headquartered in Cambridge, Maryland. DCPG's mission is to provide a public voice on land and water uses. DCPG advocates for the promotion, maintenance, and conservation of the natural resources, farmland, and open spaces of

Dorchester County. DCPG has over 90 members, including volunteers who monitor the Transquaking River and other waterways in Dorchester County.

26.     The interests of DCPG's members are negatively impacted by Defendant's violations of RCRA. Valley Proteins' actions may have created and may continue to create an imminent and substantial endangerment to the River and underlying groundwater, which threatens members' use and enjoyment of the River and may continue to present a potential human health risk.

27.     DCPG's members use the water and shoreline in and around the Transquaking River and Higgins Mill Pond for recreation including boating, paddling, fishing, wildlife watching, and enjoying the aesthetic value. Defendant's violations of CWA, RCRA, and Maryland state law have resulted in pollution which impairs the water quality, threatens public health, and harms aquatic habitats. These violations contribute to algae blooms, fish kills, and unsafe swimming conditions in the Transquaking River, its tributaries, and Higgins Mill Pond. The unsafe water quality diminishes their use and enjoyment of these waters.

28.     Plaintiff Chesapeake Bay Foundation, Inc. (CBF), founded in 1967, is a 501(c)(3) non-profit organization dedicated to protecting the Chesapeake Bay and its rivers and streams by improving water quality and reducing pollution. CBF is headquartered in Annapolis, Maryland, and maintains offices in Easton, Maryland; Richmond and Virginia Beach, Virginia; and Harrisburg, Pennsylvania. CBF represents more than 200,000 members across the country, including more than 71,900 in Maryland. CBF's mission is to "Save the Bay" and keep it saved, as defined by reaching a 70 on CBF's Health Index. *See* CBF, *About the State of the Bay Report,* https://www.cbf.org/about-the-bay/state-of-the-bay-report/about-the-state-of-the-bay-report.html (last visited Jan. 27, 2022). For over 50 years, CBF has worked to restore and protect the Chesapeake Bay through education, advocacy, restoration, and litigation.

29.     CBF's programs, resources, and interests are harmed by the current operation of the

Facility, including activities at the Facility that pollute  surface water and contaminate

groundwater.  CBF has spent millions of dollars restoring oyster reefs, trees, waterways and

wildlife habitat; advocating at the local, state, and federal level for clean water protections; and

educating students and teachers about the value of the Chesapeake Bay and its tributaries. These

efforts are harmed by pollution from the Facility that is discharged into the Transquaking River.

30.     CBF conducts extensive restoration projects throughout the Bay watershed, including the

installation of best management practices ("BMPs") such as tree plantings to create streamside

buffers and wetlands restoration projects. CBF's significant financial and staff resources devoted

to reducing pollution entering the Transquaking River, including through riparian buffer

plantings, are harmed by Permit violations and groundwater contamination at the Facility. CBF's

restoration projects are undermined and potentially offset by continued pollution from the

Facility.

31.     CBF's education programming is harmed by the pollution discharged from the Facility.

CBF owns and operates the Karen Noonan Memorial Environmental Education Center in

Crocheron, Maryland. The Karen Noonan Center sits at the mouth of Fishing Bay, where all of

the surface water from the Transquaking River drains before entering the Chesapeake Bay. CBF

educators lead kayaking trips on the Transquaking River and boating trips on Fishing Bay,

educating students and teachers about the ecology of the Eastern Shore and seining for fish,

crabs, and other Bay creatures, coming into contact with the water.

32.     Polluted waters significantly impact the efficacy of CBF's education trips. When waters

are polluted, educators and students must limit contact with the water, thereby hampering the

ability of students to investigate a given waterbody. Pollution from the Facility contributes to

harmful algae blooms and high levels of bacteria in the Transquaking River. This pollution directly impacts the use of the Transquaking River and the surrounding watershed by CBF educators, students, and teachers who participate in CBF education programs.

33.    CBF's members are harmed by the violations alleged in this Complaint. CBF members engage in a wide array of activities around the Eastern Shore, including fishing, crabbing, boating, swimming, hiking, bird watching, and oyster-gardening. CBF members rely on a healthy Bay watershed for economic, recreational, and aesthetic interests. CBF members who recreate in the Transquaking River are harmed by the operations at the Facility. Excess nutrient pollution in the surface water and the groundwater causes algae blooms in the River, contributing to fish kills and unsafe water for human contact. Members are no longer able to use the Transquaking River in the way they desire.

34.    The interests of CBF's members are negatively impacted by Defendant's violations of RCRA. Valley Proteins' actions may have created and may continue to create an imminent and substantial endangerment to the River and underlying groundwater, which threatens members' use and enjoyment of the River and may continue to present a potential human health risk.

35.    The injuries suffered by ShoreRivers and DCPG's members, and CBF and its members as a result of Defendant's actions would be redressed by a declaratory judgement that Defendant is in violation of the CWA and RCRA; an injunction preventing the Defendant from further violating the Acts; and an order requiring Defendant to assess and remediate the harm caused by its violations and imposing civil penalties and the costs of litigation, including attorney's fees and future oversight cost. A favorable decision in this matter would compel Valley Proteins to comply with applicable laws and ensure that the operation of the Facility does not continue to negatively impact the water quality the Transquaking River, water beneath the Facility, and the

Chesapeake Bay. Such a holding would lead to improvements in water quality and redress the concerns of Plaintiffs.

36.     The interests that Plaintiffs seek to protect are germane to their organizations' purposes.

37.     While Plaintiffs' members could bring suit in their own right to redress their injuries, neither the claims asserted nor the relief requested require the participation of Plaintiffs' individual members in this action.

38.     At all relevant times, Plaintiffs were and are "persons" within the meaning of CWA, 33 U.S.C. § 1362(5), and RCRA, 42 U.S.C. § 6903(15).

39.     Defendant Valley Proteins, Inc. is a private corporation that "provides services for the collection, rendering and recycling of animal processing and supermarket waste streams (fat and bone trimmings; meat/poultry waste) and restaurant cooking oil" throughout the United States. *See* Valley Proteins, Inc., "Locations", https://www.valleyproteins.com/about-us/locations/ (last visited Feb. 1, 2022). Valley Proteins, Inc. is headquartered in Winchester, Virginia.

40.     Valley Proteins is a "person" within the meaning of the CWA, 33 U.S.C. § 1362(5), and RCRA, 42 U.S.C. § 6903(15).

## STATUTORY AND REGULATORY FRAMEWORK

*Citizen Enforcement of Clean Water Act Violations*

41.     The CWA prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as an NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

42.     As "a permit or condition thereof issued under [33 U.S.C. § 1342]," the NPDES Permit is an "effluent standard or limitation" as defined by the CWA. 33 U.S.C. § 1365(f)(7).

43.     Title 9 of the Maryland Environment Code and its accompanying regulations detail Maryland's NPDES permit program.

44.      The CWA allows citizens to bring suit against "any person . . . alleged to be in violation" of an "effluent standard or limitation" established and defined under the CWA.  33 U.S.C. § 1365(a)(1)(A).

45.     The CWA authorizes ShoreRivers, DCPG, and CBF to enforce violations of Valley Protein's Permit. 33 U.S.C. § 1365(a)(1).

46.     The Permit violations alleged in this Complaint continue and will continue until this Court orders Valley Proteins to abate the violations and take all steps necessary to come into full compliance with the CWA.

47.     ShoreRivers, DCPG, and CBF have satisfied the 60-day notice provision of the CWA and no bar to citizen enforcement exists because neither EPA nor the State of Maryland have commenced a civil or criminal enforcement action in federal or state court. 33 U.S.C. § 1365(b)(1)(A), (B); 40 C.F.R. §§ 135.2, 135.3. Under the CWA, the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d).

48.     The CWA provides that any person who violates, inter alia, Section 301 of the Act, 33 U.S.C. § 1311, or who violates any condition or limitation of a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, shall be subject to a civil penalty of up to $59,973 per day per violation occurring on or after November 2, 2015, where penalties are assessed on or after January 12, 2022. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (Table 1 – Civil Monetary Penalty Inflation Adjustments).

*Citizen Enforcement of the Resource Conservation and Recovery Act*

49.     RCRA authorizes any person to commence a civil action on his or her own behalf "against any person…who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

50.     Valley Proteins is a "person" as that term is defined by RCRA. 42 U.S.C. § 6903(15).

51.     The term "solid waste" means "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities[.]" 42 U.S.C. § 6903(27).

52.     The term "hazardous waste" means "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may… pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

53.     The term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

54.     ShoreRivers, DCPG, and CBF have satisfied the 90-day notice provision of RCRA, and no bar to citizen enforcement exists because neither EPA nor the State of Maryland have

commenced a civil or criminal enforcement action in federal or state court. 42 U.S.C.

§ 6972(b)(2)(A), (B); 40 C.F.R. § 254.3.

55.     District courts have jurisdiction "to restrain any person who has contributed or who is

contributing to the past or present handling, storage, treatment, transportation, or disposal of any

solid or hazardous waste" which may present an imminent and substantial endangerment to

health or the environment and to "order such person to take such other action as may be

necessary, or both." 42 U.S.C. § 6972(a).

56.     District courts have the authority to "apply any appropriate civil penalties." 42 U.S.C.

§ 6972(a). Defendants are subject to a civil penalty of up to $81,540 per day per violation that

occurred after November 2, 2015, where penalties are assessed on or after January 12, 2022. 42

U.S.C. §§ 6972(a), 6928(g); 40 C.F.R. § 19.4 (Table 1 – Civil Monetary Penalty Inflation

Adjustments).

57.     District courts "may award costs of litigation (including reasonable attorney and expert

witness fees) to the prevailing or substantially prevailing party, whenever the court determines

such an award is appropriate." 42 U.S.C. § 6972(e).

## FACTUAL BACKGROUND

*Valley Proteins, Inc. - Linkwood Facility*

58.     The Facility currently operates under NPDES Permit No. MD0003247 (State Discharge

Permit No. 99-DP-0024). The Permit authorizes Defendant to discharge water pollution from its

poultry rendering facility to the Transquaking River in accordance with certain effluent

limitations, monitoring requirements, and other conditions set forth in the Permit.

*The Transquaking River*

59.      Valley Proteins discharges pollutants via Outfall 001 into the Transquaking River, which

13

flows to the Chesapeake Bay.

60.     Outfall 001 is a point source under the CWA. 33 U.S.C. § 1362(14).

61.     The Transquaking River is 23.2 miles long and located in Dorchester County, Maryland. The River originates south of the East New Market area and drains into the Chesapeake Bay through Fishing Bay.

62.     The Transquaking River and its tributaries are designated Use I - water contact recreation, and protection of nontidal warm water aquatic life.

63.     Parts of the lower mainstem and tributaries of the Transquaking River are designated Use II - support of estuarine and marine aquatic life and shellfish harvesting.

64.     The Transquaking River is a water of the United States within the meaning of the CWA. 33 U.S.C. § 1362(7).

65.     The Department has listed the Transquaking River under Section 303(d) of the CWA, 33 U.S.C. § 1313(d), as impaired for the following pollutants: Total Suspended Solids ("TSS") and Nutrients (Nitrogen and Phosphorus).

66.     In 2000, EPA approved the Department's Total Maximum Daily Load ("TMDL") for nutrient pollution in the Transquaking River. The TMDL lists the Defendant's Facility as contributing a major load of nutrients to the Transquaking River, and established a Waste Load Allocation in the TMDL and through the Facility's NPDES permit. MDE, Total Maximum Daily Loads of Nitrogen and Phosphorus for the Transquaking River Dorchester, Maryland, 4, 16 (Mar. 9, 2000), *available at* https://mde.maryland.gov/programs/Water/TMDL/DocLib_Transquaking_02130308/transquaking_tmdl.PDF.

67.     Excess nutrient pollution to the Transquaking River can result in algae blooms that

deplete dissolved oxygen levels in the River. Excess nutrients in the water act as a food source for algae, leading to explosive growth known as a bloom. Once the nutrients have been consumed and the algae begin to die, the decomposition of the algae in the water deplete dissolved oxygen levels. Low dissolved oxygen can lead to fish kills and unsafe water quality for aquatic life. Harmful algae blooms occur when specific species of algae create dangerous toxins, making it unsafe for humans and animals to come in contact with the water. High levels of nutrient pollution, including nitrogen, is the primary cause of harmful algae blooms in surface waters, which threaten both human and ecosystem health.

68.     High levels of nitrates in ground waters that serve as a drinking water source can disrupt respiratory and reproductive systems in humans and harm kidney and thyroid function. Nitrate pollution is especially harmful to infants and young children as it causes methemoglobinemia (Blue Baby Syndrome). When high levels of nitrates in groundwater migrate to surface water, they can fuels algae blooms which then lead to low dissolved oxygen in streams and rivers which harms and kills fish and other aquatic life. Nitrate pollution presents imminent and substantial endangerment to human health and the environment.

*The Permit*

69.     The Permit establishes, among others, the following load- or concentration-based effluent limitations:

      a.   Biochemical Oxygen Demand ($BOD_5$):

            i.   April 1 – November 30: 39 lbs/day daily maximum and 31 lbs/day monthly average.

           ii.   December 1 – March 31: 180 lbs/day daily maximum and 90 lbs/day monthly average.

    b.  Ammonia (as N):

        i.  April 1 – November 30: 23 milligrams per liter (mg/l) daily maximum and 5.5 mg/l monthly average.

        ii.  December 1 – March 31: 23 mg/l daily maximum and 10 mg/l monthly average.

    c.  Fecal Coliform: 200 MPN/100 ml.

    d.  Total Nitrogen: April 1 – November 30: 82 lbs/day daily maximum and 41 lbs/day monthly average.

    e.  Total Phosphorus 8.2 lbs/day daily maximum and 4.1 lbs/day monthly average.

    f.  Total Residual Chlorine: <0.1 mg/l daily maximum.

70.    Special Condition A and General Condition A detail how the Facility must monitor and report on operations. Special Condition A and General Condition A also require Defendant to submit timely and accurate Discharge Monitoring Reports ("DMRs") verifying compliance with Permit effluent limitations.

71.    The Permit contains numerous Special and General Conditions that establish additional enforceable requirements for the Facility's operation. The Conditions require Valley Proteins to, among other things:

    a.  maintain the Facility in efficient and good working order (General Condition B.3);

    b.  minimize and prevent adverse impacts to waters of the State or to human health (General Condition B.4);

    c.  prevent any wastes from Facility operations from entering or being placed in a location where they may enter waters of the State (General Condition B.7);

d.   report on toxic pollutant discharges (Special Condition C);

e.   provide detailed reporting regarding wastes "removed from or resulting from treatment or control of wastewaters, or facility operations" (Special Condition D);

f.   provide detailed reporting on waste sludge management and update and implement a nutrient management plan (Special Condition I);

g.   prohibit the  application of wastewater to ground (Special Condition K);

h.   develop and submit a compliance plan for nitrogen (Special Condition L);

i.   develop and submit a compliance plan for groundwater nitrates (Special Condition M);

j.   monitor and report measurements from seven onsite groundwater monitoring wells (Special Condition N); and

k.   manage stormwater through a Stormwater Pollution Prevention Plan ("SWPPP") (Special Condition R).

72.   Permit General Conditions C.15 and C.16 establish civil and criminal penalties for violations of Permit Conditions.

*Effluent Limit Exceedances*

73.   From July 2018 to October 2021, the Facility exceeded Permit effluent limits at least 43 times for pollutants including Fecal Coliform, Biochemical Oxygen Demand ("$BOD_5$"), Total Phosphorus, Total Nitrogen, and Ammonia (as N). *See* U.S. EPA, ECHO Effluent Limit Exceedances Report NPDES, Permit MD0003247, https://echo.epa.gov/trends/loading-tool/reports/effluent-exceedances?permit_id=MD0003247 ("Adjust Date Range" to Jan. 2018 - Dec. 2021; select "Apply Changes").

*Wastewater Treatment Lagoons and Groundwater*

74.     Wastewater from the Facility is held in two onsite industrial waste ponds (or "lagoons").
The lagoons are roughly 620 x 200 feet in size.

75.     The lagoons are located proximately to the Transquaking River, which runs east to west
along the southern side of the site and curves toward the northwest on the western side of the
property. The sludge lagoons are located approximately 350-400 feet from the shoreline of the
River.

76.     Based on available information and belief, one lagoon is unlined and one has an earthen
liner.

77.     The lagoons are anaerobic treatment lagoons utilized as part of the wastewater treatment
process. Anaerobic treatment is a process through which bacteria break down organic matter—
such as animal manure, wastewater biosolids, and food wastes—in the absence of oxygen.

78.      According to the Facility's Permit Fact Sheet from 2000, the wastewater generated at the
Facility consists of scrubber overflows, condensate, plant wash water, and stormwater runoff.

79.     The Facility's wastewater first passes through a roto-screen, then through a mechanical
skimmer to remove floatable solids. The solids are returned to the rendering plant for processing.
The wastewater from the skimmer is pumped to an anaerobic lagoon, where bacteria break down
organic matter in the absence of oxygen. From here, the wastewater then flows to an activated
sludge lagoon. The activated sludge lagoon has aerators to maintain oxygenation and aerobic
functions in the pond.  Mixed liquid from the pond is then sent to a clarifier to separate solid
sludge from water. The solid sludge is returned to the lagoon and the water flows to a
chlorination/de-chlorination tank for disinfection and removal of residual chlorine. Finally, the
effluent from the chlorine contact tank is discharged to a tributary of the Transquaking River via
Outfall 001.

18

80.     The wastewater in the lagoons contains multiple pollutants including nitrogen (including in the form of nitrates), ammonia, phosphorus, sulfur, and total suspended solids.

81.     The Facility sits atop several groundwater aquifers in the Atlantic Coastal Plain physiographic province—sedimentary sand, silt and clay deposits that thicken and dip toward the Atlantic Ocean. On the Eastern Shore, the Surficial Aquifer is the water-table aquifer closest to the surface.

82.     The prevailing groundwater flow at the site moves from east to west, across the site toward the Transquaking River.

83.     In 2018, 27 supply wells pulled groundwater from the shallow Surficial Aquifer within a one-mile radius of the Facility.

84.     The soil underlying the south lagoon is characterized by sandy loam and a sand mix. These soil types are well-draining with high transmissivity, meaning that groundwater flows through the entire aquifer at a high rate.

85.     Groundwater contamination at the Facility is a longstanding and persistent problem. Prior to issuance of the current Permit, the Facility, under different ownership, used spray irrigation onsite to dispose of effluent from the wastewater treatment process. The contaminated groundwater onsite led to the current Permit's Special Condition N, which requires the Defendant to maintain and operate seven groundwater monitoring wells, and report monitored values for fecal coliform, nitrate (as N), and total dissolved solids quarterly on DMRs.

86.     While nitrate levels have declined at certain wells since the early 2000s, groundwater monitoring wells at the Facility consistently measure high levels of nitrates above the federal, human-health based maximum contaminant level ("MCL") for nitrates in drinking water of   10

mg/l. At least one well every quarter from March 2005 to September 2021 recorded nitrate levels above 10 mg/l.

*Sludge Management*

87.    The sludge produced during the wastewater treatment process is removed from the Facility by a third-party disposal service. Documents received through a Public Information Act request detail that the third-party disposal service either sells the sludge to farmers for application on their fields as fertilizer, stores the sludge offsite at receiving farms, or sends the sludge out-of-state to one or more wastewater treatment facilities.

88.    Based on available information and belief, Defendant's sludge varies in physical (solid vs. liquid) and chemical composition, and contains significant amounts of nutrients.

89.    The Permit includes Conditions detailing how Valley Proteins must manage and report on its removed substances and sludge. *See* Special Condition D (removed substances reporting) and Special Condition I (sludge management and nutrient management plan). The information required by these Permit Conditions is critical to understanding the nutrient content and other characteristics of the waste produced by the Facility; informing how it must be managed or disposed of; and verifying that sludge and removed substances are, in fact, being managed to effectively protect water quality.

90.    In Defendant's Sludge Management Reports for 2015 and 2017-2020, Defendant only provides a single line of information stating the amount of "wet tons of sludge" removed "this year for maintenance."

91.    Based on available information and belief, Defendant has failed to update and implement a nutrient management plan for the duration of the current Permit (21 years).

92.     Nor has Valley Proteins submitted to MDE nutrient management plans for the farms to which Valley Proteins is shipping significant quantities of nutrient-laden sludge. The failure to submit the nutrient management plans prevents MDE and the public from verifying how the sludge is being stored and/or land-applied, and whether such land application prevents nutrient runoff to ground or surface waters.

*Facility Operation and Maintenance*

93.     MDE Inspection Reports document repeated and continuing instances of raw product and other pollutants coming into contact with the ground and/or left exposed on the site. *See, e.g.*, March 8, 2018 MDE Inspection Report (noting "raw product drainage is exposed to ground water" and raw product on "the ground area"); December 14, 2021 MDE Inspection Report ("raw material remains on the ground").

94.     MDE Inspection Reports describe overflows and spills of pollutants occurring at multiple locations at the Facility. *See, e.g.*, September 7, 2017 MDE Inspection Report (noting overflow of activated sludge at aeration tank); December 15, 2021 MDE Inspection Report ("a portion of the overflow [from oxic tank #3] reached the stream outfall"; "chlorine contact chamber shows the leakage of wastewater from the recycle pumps").

## CAUSES OF ACTION

### Count 1: Violation of Effluent Limitations of the NPDES Permit

95.     The allegations set forth in Paragraph 1 through 94 are incorporated herein by reference.

96.     The Permit establishes effluent limits detailed in Paragraph 69 above.

97.     Valley Proteins has violated Permit limits for pollutants, including Fecal Coliform, Biochemical Oxygen Demand ("$BOD_5$"), Total Phosphorus, Total Nitrogen, and Ammonia (as N), at least 43 times from July 2018 to October 2021.

98.     Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C.

§§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with a

NPDES permit.

99.     Each day that Defendant exceeded effluent limits and continues to exceed effluent limits

is a separate violation of the CWA for which a penalty of up to $59,973 can be assessed.

### Count 2: Violation of Permit General Condition B.3 - Facilities Operation

100.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

101.    General Condition B.3 requires that "[a]ll treatment, control, and monitoring facilities, or

systems installed or used by [Valley Proteins], are to be maintained in good working order and

operated efficiently."

102.    Based on information and belief, Defendant has not complied with General

Condition B.3. Defendant has failed to maintain and operate the Facility efficiently and in good

working order as demonstrated by repeated effluent limit exceedances; failure to comply with a

number of Permit conditions; failure to prevent unpermitted discharges to groundwater; and

overflows and exposure of raw product and other pollutants to the ground and to stormwater.

103.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§

1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with

conditions of a NPDES permit.

104.     Defendant has continuously failed to comply with General Condition B.3. This failure

constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

105.     Each day that Defendant failed to comply with General Condition B.3 is a separate

violation of the CWA for which a penalty of up to $59,973 can be assessed.

## Count 3: Violation of Permit General Condition B.4 - Adverse Impacts

106.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

107.    General Condition B.4 requires Valley Proteins to "minimize or prevent any adverse impact to waters of the State or to human health resulting from noncompliance with any effluent limitation specified in the Permit[.]"

108.    Based on information and belief, the Defendant has violated General Condition B.4 of the permit. Repeated and continuous effluent limit exceedances and elevated nitrate levels in groundwater monitoring wells have been documented by the Defendant's discharge monitoring reports ("DMR") for at least the last 13 years. The Defendant has not taken reasonable steps to minimize the adverse impact of these effluent limit exceedances.

109.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

110.     Defendant has continuously failed to comply with General Condition B.4. This failure constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

111.    Each day that Defendant failed to comply with General Condition B.4 is a separate violation of the CWA for which a penalty up to $59,973 can be assessed.

## Count 4: Violation of Permit General Condition B.7 - Removed Substances

112.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

113.    General Condition B.7 directs that waste "removed from or resulting from treatment or control of wastewaters, or facility operations, shall be disposed of in a manner to prevent...runoff from such substances from entering or from being placed in a location where they may enter the waters of the State."

114.    The Facility's operations and its handling, treatment, and storage of wastewater, waste sludge, and other wastes is resulting in discharges of pollutants to waters of the State, in violation of General Condition B.7.

115.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

116.    The Defendant has continuously failed to comply with General Condition B.7. This failure constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

117.    Each day that Defendant failed to comply with General Condition B.7 is a separate violation of the CWA for which a penalty of up to $59,973 can be assessed.

## Count 5: Violation of Permit Special Condition I - Sludge Management Reporting Requirements and Nutrient Management Plan

118.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

119.    Special Condition I.1 requires Valley Proteins to submit an annual report to the Department detailing: "the quantity of sludge expected to be generated and how all sludge generated at the facility shall be disposed of. The Report shall include the quantities to be land applied under a nutrient management plan and the quantities to be disposed of by other methods."

120.    Special Condition I.2 states that, "[w]ithin 180 days after the effective date of the permit, and whenever necessary thereafter, the permittee shall update and implement the current nutrient management plan upon approval by the Department in accordance with changes in COMAR 15.20.08."

121.    In the Sludge Management Reports submitted by Defendant for at least 2015 and 2017-2020, Defendant does not explain how all sludge generated at the Facility would be disposed of,

including the quantities to be land applied under a nutrient management plan or by other methods. The Facility's method of managing waste sludge and inadequate reporting on such management make it impossible for Valley Proteins, MDE, or the public to verify compliance with Permit General Condition B.7. *See* Count 4 above.

122.    Defendant's Sludge Management Reports are incomplete and fail to satisfy the requirements of Special Condition I.1. This failure constitutes an enforceable violation of a CWA permit. 33 U.S.C. § 1365(a)(1)(A).

123.    Based on available information, Defendant has failed to update and implement a nutrient management plan for the duration of the current Permit (21 years), in violation of Special Condition I.2.

124.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

125.    Accordingly, Defendant has continuously failed to comply with Special Conditions I.1 and I.2. This failure constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

126.    Each day during the years Defendant failed to comply with Special Conditions I.1 and I.2. is a separate violation of the CWA for which a penalty of up to $37,500 per day for each violation occurring through November 2, 2015, and $59,973 per day for each violation thereafter can be assessed.

## Count 6: Violation of Permit Special Condition K - Prohibition on Application of Wastewater to Ground

127.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

128.    Special Condition K prohibits Valley Proteins from "using the existing spray irrigation field or any other method of wastewater disposal to the ground that may result in the discharge of wastewater into the ground waters of the State."

129.    The operations at the Facility are likely resulting in discharges of pollutants to waters of the State, in violation of Special Condition K.

130.    The Facility's treatment and storage of wastewater in the lagoons is likely resulting in discharges of pollutants to waters of the State, in violation of Special Condition K.

131.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

132.    Defendant has continuously failed to comply with Special Condition K. This failure constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

133.    Each day  that Defendant failed to comply with Special Condition K is a separate violation of the CWA for which a penalty of up to $59,973, can be assessed.

### Count 7: Violation of Permit Special Condition L - Compliance Plan for Nitrogen

134.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

135.    Special Condition L requires Valley Proteins to submit "a compliance plan for meeting the nitrogen limits" in the Permit.

136.    Based on information and belief, Defendant has not submitted a compliance plan for nitrogen as required by Special Condition L.

137.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

138.    Defendant has continuously failed to submit the required compliance plan and supporting documents for meeting nitrogen limits, in violation of Special Condition L. This failure constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

139.    Each day that Defendant failed to comply with Special Condition L is a separate violation of the CWA for which a penalty of up to $59,973 can be assessed .

### Count 8: Violation of Permit Special Condition M - Compliance Plan for Groundwater Nitrates

140.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

141.    Special Condition M requires Valley Proteins to submit "a plan and schedule for investigating the cause of high nitrates in the groundwater at the facility."

142.    Based on information and belief, Defendant has not submitted a compliance plan for groundwater nitrates as required by Special Condition M.

143.    Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

144.    Defendant has continuously failed to submit the required compliance plan and supporting documents for investigating the cause of high nitrates in the groundwater at the Facility, in violation of Special Condition M. This failure constitutes an enforceable violation of the CWA. 33 U.S.C. § 1365(a)(1)(A).

145.    Each day that Defendant failed to comply with Special condition M is a separate violation of the CWA for which a penalty of up to $59,973 can be assessed.

### Count 9: Unpermitted/Unauthorized Discharge to the Transquaking River

146.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

147.    As described above in Paragraphs 85 through 86, operations at the Facility have contributed and likely continue to contribute pollution to the shallow soils and groundwater at the site.

148.    As described in Paragraphs 81 and 82, shallow groundwater flows from east to west across the site, to the Transquaking River.

149.    Based on information and belief, pollutant discharges to the Transquaking River have occurred and continue to occur via groundwater transport, outside of the permitted discharges to Outfall 001, and are therefore unpermitted discharges to the Transquaking River.

150.    As a result of unpermitted discharges via groundwater to the Transquaking River, Defendant has violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

151.    Each day that pollution was discharged to groundwater and transported to the Transquaking River is a separate violation of the CWA for which a penalty of up to $59,973 can be assessed.

## Count 10: Violation of State Law Prohibition on Unauthorized Discharges of Pollutants

152.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

153.    State law prohibits the unauthorized discharge of pollutants to waters of the State. MD. CODE ANN., ENVIR. § 9-322.

154.    The definition of "Waters of this State" includes groundwater. MD. CODE ANN., ENVIR. § 9-101(l).

155.    The Facility's operations have caused and are likely to cause unauthorized discharges to waters of the State. As detailed above, there is a likely pathway or pathways of contamination or

discharge from the Facility other than discharge from permitted Outfall 001. The Facility's current Permit does not authorize these discharges and Plaintiffs are unaware of any State groundwater discharge permit or other permit that would authorize these discharges. These discharges are not permitted and are therefore a violation of State law.

156.    It is likely that these discharges have occurred consistently over at least the last five years in violation of State law.

157.    Each day that pollution was discharged to groundwater is a separate violation of State law for which a penalty of up to $10,000 can be assessed. MD. CODE ANN., ENVIR. § 9-342(a).

### Count 11: Violation of the Resource Conservation and Recovery Act

158.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

159.    Defendant treats and stores process wastewater and sludge in lagoons with permeable barriers to the soil and groundwater below.

160.    The sludge in the lagoons at the Facility is a solid waste within the meaning of RCRA. 42 U.S.C. § 6903(5) (defining "hazardous waste"), (27) (defining "solid waste").

161.    The treatment and storage of wastewater and sludge in the lagoons constitutes disposal of a solid waste into an open dump, as defined by RCRA. 42 U.S.C. § 6903(3) (defining "disposal"), (14) (defining "open dump").

162.    Defendant has contributed and is contributing to the past and present handling, storage, treatment, transportation, and disposal of solid waste at the Facility. Storing wastewater sludge in unlined and/or permeable lagoons where waste may enter the environment or be discharged into ground and/or surface waters, constitutes disposal. 42 U.S.C. § 6903(3).

163.    Defendant's handling, storage, treatment, transportation, and disposal of solid waste may present an imminent and substantial endangerment to health and the environment. 42 U.S.C. § 6972(a)(1)(B).

164.    Defendants are liable for all injunctive relief necessary to abate the endangerment, all costs and attorneys and expert witness fees, and any other relief this Court deems appropriate.

165.    Defendants are subject to a civil penalty of up to $81,540 per day per violation that occurred after November 2, 2015, where penalties are assessed on or after January 12, 2022. 42 U.S.C. §§ 6972(a), 6928(g); 40 C.F.R. § 19.4 (Table 1 – Civil Monetary Penalty Inflation Adjustments).

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that the Court:

A.  Declare that the Defendant is in violation of the Clean Water Act;

B.  Declare that the Defendant is in violation of the Resource Conservation and Recovery Act;

C.  Enjoin Defendant from further violation of the Clean Water Act;

D.  Enjoin Defendant from further violation of the Resource Conservation and Recovery Act;

E.  Order Defendant Valley Proteins, Inc. to:

    a.  Immediately comply with all Permit terms and conditions;

    b.  Immediately comply with the Clean Water Act;

    c.  Immediately comply with the Resource Conservation and Recovery Act;

    d.  Assess and remediate the harm caused by violations of the Clean Water Act;

    e.  Assess and remediate the harm caused by violations of the Resource Conservation and Recovery Act;

F.  Assess civil penalties against the Defendant;

G.  Award Plaintiffs the cost of litigation, including reasonable attorney's fees, costs, and

    expert fees and expenses;

H.  Retain jurisdiction until Defendant has fulfilled all legal and Court-ordered obligations;

    and;

I.  Grant such further relief as the Court deems just and proper.

Dated: February 2, 2022

Respectfully submitted,


*/s/ Patrick DeArmey*
Patrick DeArmey – Bar No. 21906
Chesapeake Legal Alliance
501 Sixth Street
Annapolis, MD 21403
Telephone: (410) 216-9441
Fax: (410) 216-7077
Email: patrick@chesapeakelegal.org

*Attorney for Plaintiffs ShoreRivers and
Dorchester Citizens for Planned Growth*

*/s/ Brittany Wright*
Brittany Wright – Bar No. 21029
Jon Mueller – Bar No. 17142
Ariel Solaski – CPF No. 2110150007*
Chesapeake Bay Foundation
6 Herndon Avenue
Annapolis, MD 21403
Telephone: (443) 482-2025
Fax: (410) 268-6687
Email: bwright@cbf.org

*Attorneys for Plaintiff Chesapeake Bay
Foundation, Inc.*
*Admission to the District of Maryland pending